# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued March 27, 2006           Decided August 22, 2006

No. 05-1054

CITY OF TACOMA, WASHINGTON,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SKOKOMISH INDIAN TRIBE, ET AL.,
INTERVENORS

———

Consolidated with
05-1093, 05-1180, 05-1181

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Sam Kalen* and *Stephen H. Goodman, Jr.* argued the cause
for petitioners City of Tacoma, Washington and Save the Lakes
Coalition. With them on the briefs were *Michael A. Swiger* and
*Susan A. Moore*.

*Mason D. Morisset* argued the cause and filed the briefs for
petitioner Skokomish Indian Tribe.

*John Katz*, Deputy Associate General Counsel, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Lisa E. Jones*, Attorney, United States Department of Justice, argued the cause for intervenors the United States Department of Interior and the United States Department of Commerce. With her on the brief was *M. Alice Thurston*, Attorney.

*Daniel H. Squire* was on the brief for intervenors American Rivers, et al.

Before: GINSBURG, *Chief Judge*, and ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: These consolidated cases seek our review of a series of orders issued by the Federal Energy Regulatory Commission ("FERC" or "Commission"), granting a conditional license to the City of Tacoma ("Tacoma") to operate a hydroelectric project on the Skokomish River in the State of Washington. We deny the petitions in part, grant the petitions in part, and remand for further proceedings, without vacating the license.

I

In 1924, Tacoma obtained a license from the Federal Power Commission to flood 8.8 acres of national forest land by damming the North Fork of the Skokomish River at Lake Cushman on the Olympic Peninsula. This license was designated a "minor part license" because it covered only a

small part of Tacoma's much larger hydroelectric project (the "Cushman Project"). At that time, the Federal Power Commission interpreted its licensing authority narrowly, and therefore, the 1924 minor part license gave Tacoma the authority it needed to proceed with the Cushman Project. In the ensuing years, Tacoma built two dams across the North Fork river. The first dam greatly increased the size of Lake Cushman, and the second dam created Lake Kokanee further downstream. Tacoma also constructed two hydroelectric plants, one at the upper dam and a second near Hood Canal, which adjoins Puget Sound. Between Lake Kokanee and Hood Canal, Tacoma diverted virtually all the water from the North Fork riverbed into a pipeline, thereby maximizing the generating power of the river. Nevertheless, some distance downhill from Lake Kokanee, water continued to flow into the North Fork riverbed from McTaggert Creek, and recently Tacoma has released into the riverbed an additional flow of sixty cubic feet per second ("cfs").

The five-thousand-acre reservation of the Skokomish Indian Tribe ("Tribe") is located near the mouth of the Skokomish River, with Hood Canal as its northeastern border and the Skokomish River as its eastern, southeastern, and southern borders. The reservation was established in 1855 by the Treaty of Point No Point, which guarantees certain rights to the Tribe, including the right to take fish from the Skokomish River. The Cushman Project's second hydroelectric plant is situated within the boundary of the reservation, on property Tacoma owns in fee, and an access road and transmission line run across reservation property. The Cushman Project did not remove all water from the section of the Skokomish River that borders the Tribe's reservation; the lower portion of the river continues to be fed by the South Fork and also the small flow that remains in the North Fork. Nevertheless, the Cushman Project sharply reduced water levels, thereby affecting fish populations and

increasing silt deposits. The Tribe asserts that the historic mean annual water-flow in the North Fork was eight-hundred cfs. If this figure is accurate, then even accounting for the sixty cfs that Tacoma is now releasing into the North Fork riverbed, Tacoma is still diverting about 92.5 percent of the North Fork's water.

In 1963, the Federal Power Commission determined that its hydroelectric licensing jurisdiction extends to whole projects, not just to the parts of those projects that occupy or use federal land. *See Pac. Gas & Elec. Co.*, 29 FPC 1265, 1266 (1963) (*PG&E I*). On that basis, the Commission concluded certain minor part licenses under consideration in that proceeding had been "improperly issued" based on an "erroneous conclusion of law." *Id.* This holding cast a shadow of doubt over all projects that were then operating under minor part licenses, including the Cushman Project, but Tacoma nevertheless continued to operate the project under the terms of its 1924 minor part license.

In 1974, Tacoma's minor part license expired, and Tacoma applied for a new license, expressly seeking a "major project license" that would cover all its project-related facilities. Pursuant to section 15 of the Federal Power Act ("FPA" or the "Act"), 16 U.S.C. § 808(a)(1), which is the section governing relicensing, the Commission is required to issue annual renewals of the existing license during the application review period that precedes issuance of a new long-term license. The Commission therefore issued Tacoma an annual license, and as a consequence of repeated delays, Tacoma operated the project for the next twenty-four years under these annual renewals.

The array of matters addressed during this lengthy review period included: (1) the state certification required under section 401(a) of the Clean Water Act, 33 U.S.C. § 1341(a); (2) the state "concurrence" required under section 307(c)(3)(A) of the Coastal Zone Management Act, 16 U.S.C. § 1456(c)(3)(A);

(3) the consultations with state and federal wildlife agencies required under section 10(j) of the FPA, *id.* § 803(j); and (4) the consultations with the Advisory Council on Historic Preservation required under section 106 of the National Historic Preservation Act, *id.* § 470f. In addition, FERC (the successor agency to the Federal Power Commission) prepared an environmental impact statement as required by the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C), and the Department of the Interior ("Interior"), as the agency supervising the Tribe's reservation, prepared a list of "conditions" to be included in Tacoma's new license pursuant to section 4(e) of the FPA. *See* 16 U.S.C. § 797(e).

The Tribe also petitioned FERC in 1992 for an order declaring the proceeding to be an original license proceeding, not a relicensing. Among other things, the Tribe was seeking to establish pre-1924 environmental conditions as the baseline for FERC's analysis of environmental impact, arguing that most of the project had never been the subject of any license proceeding. FERC rejected the Tribe's argument, stating, "We . . . conclude that the subsequent licensing of a major project with an expiring minor part license is not an original licensing proceeding, but is a relicensing proceeding which is governed by the relicensing provisions of section 15 of the FPA." *City of Tacoma*, 67 FERC ¶ 61,152, at 61,443 (1994). FERC also specifically rejected the use of pre-1924 environmental conditions as the baseline for measuring environmental impact. *See id.* at 61,443-44.

FERC finally completed the application review process in 1998, and on July 30th of that year, FERC issued a forty-year major license for the Cushman Project, imposing a number of conditions designed, among other things, to protect the environment, to remedy past environmental impacts, to restore fish populations, and otherwise to mitigate the effect of the project on the Tribe's reservation. *See City of Tacoma*, 84

FERC ¶ 61,107, at 61,578-99 (1998). FERC rejected Interior's section 4(e) conditions, but article 407 of the license requires Tacoma to release a minimum flow of 240 cfs (or inflow, whichever is less) into the North Fork riverbed, below Lake Kokanee, and this requirement partially satisfies one of Interior's conditions.

Several parties petitioned for rehearing. Tacoma's petition asserted that, under the terms of the license, the Cushman Project would cost more to operate than the value of the power it generated. The Tribe's petition asserted that the license did not adequately protect the environment or the Tribe's reservation and should have included all of Interior's section 4(e) conditions. The Tribe also contested whether the requirements of the Clean Water Act, the Coastal Zone Management Act, and the National Historic Preservation Act had been satisfied. In a series of orders, FERC (1) denied several petitions for rehearing; (2) clarified that Tacoma could defer its final decision as to whether to accept or reject the new license until after completion of the appeal process; and (3) granted a stay of the new license pending judicial review, thereby permitting Tacoma to continue operations without satisfying any of the license conditions.

Several petitions for review were filed in this court, but we remanded without any decision on the merits because the listing of two salmon species as endangered pursuant to the Endangered Species Act ("ESA"), *see* 16 U.S.C. § 1533, necessitated consultations between FERC and the National Marine Fisheries Service (the "Fisheries Service") regarding the impact of the Cushman Project on these species, *see id.* § 1536(a), and we anticipated that these consultations might result in significant license changes. After remand, FERC also entered into consultations with the Fish and Wildlife Service regarding the impact the project would have on a third species,

the bull trout. Pursuant to section 7(b) of the ESA, *id.* § 1536(b), the Fisheries Service and the Fish and Wildlife Service began preparing biological opinions ("BiOps") detailing their expert findings regarding the impact FERC's proposed action would have on the endangered species and specifying "reasonable and prudent measures" FERC needed to take to minimize any "incidental taking" of the species. *Id.* § 1536(b)(4).

More delays followed, and in September 2003, FERC ordered a "nonadversarial" factfinding hearing before an administrative law judge ("ALJ") in an effort to move the matter forward. In December 2003, the Fisheries Service and the Fish and Wildlife Service issued draft versions of their BiOps, and the ALJ was able to take those draft BiOps into consideration. That same month, the ALJ issued a report emphasizing the critical importance of releasing a minimum flow of 240 cfs into the North Fork riverbed, even on an interim basis, to benefit endangered salmon. A few months later, in March 2004, the Fisheries Service and the Fish and Wildlife Service issued their final BiOps, and in June, FERC amended the license for the Cushman Project, adding specific protections for the endangered species, as recommended in the BiOps. In the same order, FERC partially lifted its stay, thereby requiring the 240 cfs minimum flow the ALJ had recommended in his report. In February 2005, FERC granted in part and denied in part requests for rehearing, making relatively minor additional amendments to the license, and in March 2005, FERC denied rehearing of its February order.

Several petitions challenging FERC's orders are consolidated in this proceeding. On May 3, 2005, we granted a motion for a stay of the 240 cfs minimum-flow requirement. Tacoma thus continues to operate the Cushman Project without any significant license conditions, as it has done for

approximately eighty years. It also continues to divert nearly all the water from the North Fork River, as it has done for approximately eighty years. Tacoma has consistently asserted that the 240 cfs minimum flow will necessitate a shut down of the project.

## II

### A

The Tribe's petition argues that Tacoma has reaped huge profits operating a largely unlicensed hydroelectric project for nearly eighty years, while ignoring the devastating impact its actions have had on the Tribe's traditional lifestyle. Tacoma has almost completely removed the water from the North Fork of the Skokomish River, and it has sharply reduced water levels in the mainstem of the river. The result, the Tribe asserts, has been a major alteration of the local environment, a devastating drop in the fish populations, and damage to natural resources of great economic and cultural significance to the Tribe. All of these factors weigh against the license, argues the Tribe, but in addition, the Tribe relies on article 4 of the Treaty of Point No Point, which provides in relevant part: "The right of taking fish at usual and accustomed grounds and stations is . . . secured to said Indians . . . ." While the Tribe arguably still has the right to "tak[e] fish at usual and accustomed grounds," that right is now of little value, because the water has disappeared, and with it, the fish.

The Tribe already litigated most of these points before FERC in the early 1990s, and FERC gave persuasive reasons for rejecting the Tribe's arguments. As noted, the Tribe filed a petition in 1992 asking FERC to treat Tacoma's application as an application for an *original* license, rather than a section 15 relicensing proceeding. In the same petition, the Tribe sought

to establish pre-1924 environmental conditions as the baseline for measuring the environmental impact of the Cushman Project. As the Tribe viewed the situation, most of the Cushman Project had never been the subject of a FERC licensing proceeding, but Tacoma was nevertheless assuming the preferred status of a licensee seeking merely to renew a license for an approved project. According to the Tribe, unless FERC treated Tacoma's application as an application for an original license, the severe impact of the Cushman Project on the Tribe's reservation (and its way of life) would escape regulatory review altogether.

Two points put these arguments in context. First, the primary focus of the FPA in 1924 was on development of the nation's natural resources, and the Act did not include many of the environmental protection provisions on which the Tribe now relies. Therefore, even if the Commission had licensed the entire Cushman Project back in 1924, instead of only a minor part of that project, it is doubtful it would have imposed significantly different license conditions. The Commission was certainly aware of the full scope of the Cushman Project when it issued the 1924 minor part license, and it could have withheld the minor part license if it had been opposed to the project.

Second, in 1924, Tacoma obtained the regulatory approvals it was required to obtain *as of that time*, based on the Commission's then-narrow interpretation of its licensing authority. Therefore, the assertion that Tacoma should be penalized, at the relicensing stage, for having only a minor part license is unfounded.

FERC made essentially these points in its 1994 declaratory order in which it found the instant proceeding to be a relicensing, not an original licensing. *See* 67 FERC at 61,441-44. The Tribe, however, argues that FERC had no statutory authority for conducting a relicensing proceeding, and therefore

the license it issued in 1998 is invalid. The Tribe points out that in *PG&E I* the Commission held that minor part licenses similar to Tacoma's 1924 license were "improperly issued" based on an "erroneous conclusion of law." 29 FPC at 1266. On this basis, the Tribe argues the Cushman Project has never operated under a valid license, and a relicensing proceeding only compounds this error by treating the 1924 license as if it were valid.

The Commission addressed this question in a somewhat different context in *Pac. Gas & Elec. Co.*, 56 FPC 994 (1976) (*PG&E II*). In *PG&E II*, the Commission granted an application for surrender of a minor part license and issuance of a new major license, and in the course of its decision, it discussed the appropriate effective date for the new license. *Id.* at 1006-08. The Commission rejected the conclusion that its 1963 decision in *PG&E I* effectively invalidated all minor part licenses and therefore the date of that decision should constitute the date of surrender:

> While the Commission stated [in the 1963 decision] that minor-part licenses were based on an 'erroneous conclusion of law' and were 'improperly issued,' we do not believe it is appropriate to accept the proposed surrender as of the date of the 1963 decision. We also do not establish the effective date of the [new] license as the date of the 1963 decision. The effective date of the surrender of the minor-part license and the effective date of the [new] license for the project works are the first day of the month in which this order is issued.

*Id.* at 1007. The Commission added:

> In view of the 1963 decision and our reconsideration of minor-part licenses herein, we are directing the Secretary to serve this order on all minor-part licensees and to direct

> those licensees to file a schedule for submission of a license application covering all project works of a project as defined in Section 3(11) of the [FPA].

*Id.* at 1008. In other words, the Commission determined that projects operating under minor part licenses prior to the 1976 decision were operating under adequate licenses, though as of the 1976 decision, they were on notice that they needed to apply for major licenses.

We agree with the Commission's conclusion that minor part licenses issued prior to 1963 were adequate even if issued based on an erroneous conclusion as to the scope of the Commission's licensing authority. Significantly, the Commission's issuance of a minor part license in 1924 was not an *ultra vires* act. The Commission erred by construing its authority too narrowly, not in acting beyond the bounds of its mandate. Therefore, even if the Commission erred in issuing Tacoma a minor part license in 1924, the minor part license it issued was not inherently improper or lacking in legal force. When the Commission later reinterpreted its licensing jurisdiction more broadly, we think the Commission had discretion to recognize the legitimacy of existing minor part licenses and, on that basis, to apply the relicensing provision found in section 15 of the FPA.

The Tribe points out, however, that section 15 nowhere expressly refers to minor part licenses or authorizes relicensing upon expiration of a minor part license. The Tribe is correct that section 15 is not specific in this regard. It provides simply that FERC can "issue a new license" to the licensee "at the expiration of the existing license." 16 U.S.C. § 808(a)(1). Nevertheless, we think this statutory language is broad enough to permit the interpretation FERC has given it, and because we find FERC's interpretation to be reasonable, we defer to it. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*,

467 U.S. 837, 842-43 (1984).

The Tribe argues that *Chevron* deference does not apply here because this case involves an Indian tribe. In support of this argument, the Tribe cites *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001), in which we found *Chevron* deference inapplicable to the Secretary of the Interior's interpretation of the Indian Trust Fund Management Reform Act, because "the trust relationship between the United States and the Native American people" requires liberal construction of statutes in favor of Indian tribes. This principle only applies, however, to provisions of the law that are "for the benefit of Indian tribes." *Id.* at 1103 (quoting *Bryan v. Itasca County*, 426 U.S. 373, 392 (1976)). The FPA includes at least one provision for the benefit of Indian tribes (section 4(e)), but the Act's relicensing provision (section 15) cannot be characterized that way, and therefore the Tribe's argument fails.

In sum, we reject the Tribe's argument that FERC erred in conducting a relicensing proceeding rather than an original license proceeding.

B

The Tribe asserts that FERC violated section 4(e) of the FPA by not including Interior's section 4(e) conditions in Tacoma's new license. Section 4(e) of the FPA, 16 U.S.C. § 797(e), provides

> [t]hat licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls

shall deem necessary for the adequate protection and utilization of such reservation[.]

In this case, Interior is the federal agency under whose supervision the Skokomish Indian Reservation falls, and on August 4, 1997, the Secretary of the Interior submitted section 4(e) conditions to FERC. FERC rejected these conditions because they "were not timely filed." *City of Tacoma*, 84 FERC at 61,549, *order on reh'g*, 86 FERC ¶ 61,311, at 62,074 (1999).

The FPA does not indicate what, if any, time limitation applies in this context, but FERC has imposed a strict time limitation, now codified at Title 18, § 4.34(b) of the Code of Federal Regulations, which provides in relevant part:

> All comments (including mandatory . . . terms and conditions or prescriptions) on an application for . . . [a] license must be filed with the Commission no later than 60 days after issuance by the Commission of public notice declaring that the application is ready for environmental analysis. . . . A commenter . . . may obtain an extension of time from the Commission only upon a showing of good cause or extraordinary circumstances in accordance with § 385.2008 of this chapter. . . . Late-filed . . . terms and conditions, or prescriptions will be considered by the Commission under section 10(a) of the Federal Power Act if such consideration would not delay or disrupt the proceeding.

18 C.F.R. § 4.34(b). The regulation also states:

> [I]f ongoing agency proceedings to determine terms and conditions or prescriptions are not completed by the date specified, the agency must submit to the Commission by the

due date: (i) Preliminary terms and conditions or prescriptions and a schedule showing the status of the agency proceedings and when the terms and conditions or prescriptions are expected to become final; or (ii) A statement waiving the agency's right to file the terms and conditions or prescriptions or indicating the agency does not intend to file terms and conditions or prescriptions.

*Id.* § 4.34(b)(1) (paragraph breaks omitted).

In accordance with this regulation, Interior's section 4(e) conditions were due on October 31, 1994. Interior, however, did not submit its conditions, or even preliminary conditions, by that date. Instead, Interior submitted a letter stating that, because of the complexity of the project, it would submit *preliminary* conditions within two years. In this letter, Interior also questioned FERC's authority to impose a time restriction on responsibilities the FPA expressly delegated to the Secretary of the Interior. Interior complained that FERC's short time restriction was "unworkable," "as a practical matter . . . not possible," and in conflict with FERC's "trust responsibility to protect the lands and resources of Indian Tribes." Two years later, Interior submitted preliminary section 4(e) conditions, as it said it would do, and about nine months after that, it submitted its final conditions, which FERC rejected as untimely. *See City of Tacoma*, 84 FERC at 61,549, *order on reh'g*, 86 FERC at 62,074.

We conclude FERC exceeded its statutory authority by placing a strict time restriction on responsibilities Congress delegated to other federal agencies. The FPA provides that licenses "within any reservation" "shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation[.]"

16 U.S.C. § 797(e). The FPA gives FERC no discretion in this regard. Though FERC makes the final decision as to *whether* to issue a license, FERC *shares* its authority to impose license conditions with other federal agencies. *See Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765, 772-79 (1984). To the extent Congress has delegated licensing authority to agencies other than FERC, those agencies, and not FERC, determine how to exercise that authority, subject of course to judicial review. FERC can no more dictate to Interior when Interior should complete its work than Interior can dictate to FERC when FERC should do so. Here, FERC took all the time it needed—a full 24 years—to issue a license to Tacoma. Interior, in contrast, produced its license conditions within about three years of receiving notice on August 1, 1994.

To be sure, Interior and FERC should certainly make every effort to cooperate and to coordinate their efforts, because license conditions imposed by one agency may alter the conditions the other agency deems necessary. Furthermore, when two or more federal agencies have shared authority to impose license conditions, they can certainly agree on an appropriate time frame to govern the process. FERC, however, has no authority to impose a short 60-day limitation unilaterally, thereby effectively stripping Interior of its statutorily delegated authority.

A further question relates to the scope of Interior's statutorily delegated authority, which according to the express terms of section 4(e) extends only to "licenses . . . issued within any reservation." 16 U.S.C. § 797(e). In *FPC v. Tuscarora Indian Nation*, 362 U.S. 99, 110-15 (1960), the Supreme Court held that only land actually owned by the United States qualifies as reservation land for purposes of the FPA. Out of all the various facilities that constitute the Cushman Project, the lower of the two generating plants, an access road, and a transmission

line are within the boundary of the reservation, but the generating plant is on land Tacoma owns in fee. Therefore, only the transmission line and the access road are "within" the reservation for purposes of the FPA, but this is sufficient.

FERC concluded that Interior's authority to impose section 4(e) conditions was limited to mitigating the relatively small impact the transmission line and access road had (and would have) on the reservation, and it did not extend to the much greater impact the dams and water diversion had (and would have) on the reservation. *See City of Tacoma*, 84 FERC at 61,548-49, *order on reh'g*, 86 FERC at 62,074-76. In reaching this conclusion, FERC relied on its prior decision in *Minnesota Power & Light Co.*, 75 FERC ¶ 61,131, at 61,447-48 (1996), in which it had rejected Interior's assertion of a broad right to impose license conditions based on the presence of any small part of a project on reservation land. In *Minnesota Power*, FERC stated:

> Interior's theory could lead to any number of results that would be inconsistent with the letter and intent of section 4(e). For example, if a project is located entirely on private land with the exception of a small segment of a power line that crossed the corner of a reservation, Interior's theory would allow it to set minimum instream flows and impose other conditions on aspects of the project that have absolutely no impact on the reservation. . . . We do not interpret section 4(e) to require such [an] outcome[].

*Id.* at 61,448. FERC cited *Escondido* in support of this conclusion, but *Escondido* actually suggests a different rule.

The Supreme Court in *Escondido* considered whether Interior could impose section 4(e) conditions "any time a reservation is 'affected' by a licensed project even if none of the

licensed facilities is actually located on the reservation." 466 U.S. at 782-83. The Court rejected this argument, stating, "Congress intended . . . the conditioning power of the Secretary [of the Interior] to apply only with respect to [a] . . . reservation upon which any project works were to be located." *Id.* at 782. Significantly, the Court referred to *any* project works, which would seem to include, contrary to FERC's conclusion, even "a small segment of a power line that crosse[s] the corner of a reservation." *Minnesota Power*, 75 FERC at 61,448. Later in its opinion, the Court stated, "[I]t is clear that Congress concluded that reservations were not entitled to the added protection provided by the proviso of § 4(e) unless *some* of the licensed works were actually within the reservation." *Escondido*, 466 U.S. at 784 (emphasis added). "[S]ome" means "some"; it does not mean "all," or even "a lot." The issue under consideration in *Escondido* was whether Interior can impose license conditions based on the *indirect* effects a project has on a reservation. Therefore, the implication of the court's statements is that Interior can do so provided that at least "some" or "any" part of the licensed facilities is on reservation land.

This conclusion is consistent with the plain meaning of the statutory language. All the parties agree Tacoma's Cushman Project is "within [a] reservation" at least to the extent of the access road and transmission line, and section 4(e) provides that licenses issued "within [a] reservation" "shall be subject to and contain such conditions as the Secretary [of the Interior] . . . shall deem necessary for the adequate protection and *utilization* of such reservation." 16 U.S.C. § 797(e) (emphasis added). This language nowhere limits Interior's regulatory authority to those portions of the project that are on the reservation. On the contrary, so long as some portion of the project is on the reservation, the Secretary is authorized to impose any conditions that will protect the reservation, including *utilization* of the

reservation in a manner consistent with its original purpose.

We conclude, therefore, that the Secretary of the Interior is not limited in this proceeding to mitigating the impact the access road and the transmission line will have on the reservation. Instead, he may impose license conditions that are designed to mitigate the effect of the project on the Skokomish River to the extent doing so is reasonably related to protecting the reservation and the Tribe. Moreover, the FPA gives FERC no discretion to reject Interior's section 4(e) conditions, *Escondido*, 466 U.S. at 777-79, though FERC is "free to express its disagreement" with the conditions "in connection with the issuance of the license" or "on [judicial] review," and it also has the option of not issuing the license, *id.* at 778 n.20. Here, because FERC rejected Interior's section 4(e) conditions as untimely, FERC did not argue against the conditions on the merits, which perhaps would have persuaded Interior to change some of the conditions, and it did not rule on whether, with the conditions included, the license should nevertheless issue. For the same reason, the record before us might not include all of Interior's evidentiary support for the conditions, and no party has had an opportunity to challenge the validity of the conditions in a petition for review. Therefore, our decision should not be read as foreclosing the Commission from deciding not to issue the license as modified by the section 4(e) conditions, or if it does issue the license, foreclosing the petitioners from future litigation over the conditions.

C

The Tribe argues that, in issuing the license, FERC violated its obligations under the Clean Water Act. Section 401 of the Clean Water Act requires a water quality "certification" from the appropriate state government agency before FERC can license a hydroelectric project like the Cushman Project. 33

U.S.C. § 1341(a)(1). On April 30, 1985, the State of Washington Department of Ecology ("Ecology") issued a conditional certification for the Cushman Project, and Tacoma appealed that certification to the state's Pollution Control Hearings Board. Pursuant to a settlement between Ecology and Tacoma, Ecology issued a new conditional certification on December 30, 1987. Ecology, however, was unable to produce records showing that it gave public notice or held a hearing with respect to either certification.

In most cases, if a party seeks to challenge a state certification issued pursuant to section 401, it must do so through the state courts. The reason for this rule is plain enough. The Clean Water Act gives a primary role to states "to block . . . local water projects" by imposing and enforcing water quality standards that are more stringent than applicable federal standards. *Keating v. FERC*, 927 F.2d 616, 622 (D.C. Cir. 1991). Therefore, the decision whether to issue a section 401 certification generally turns on questions of state law. FERC's role is limited to awaiting, and then deferring to, the final decision of the state. Otherwise, the state's power to block the project would be meaningless. *Id.*

The reason for this rule, however, also establishes its outer limits. If the question regarding the state's section 401 certification is not the application of state water quality standards but compliance with the terms of section 401, then FERC must address it. This conclusion is evident from the plain language of section 401: "No license or permit shall be granted until the certification *required by this section* has been obtained or has been waived . . . ." 33 U.S.C. § 1341(a)(1) (emphasis added). FERC, in other words, may not act based on any certification the state might submit; rather, it has an obligation to determine that the specific certification "required by [section 401] has been obtained," and without that certification,

FERC lacks authority to issue a license.

This obligation does not require FERC to inquire into every nuance of the state law proceeding, especially to the extent doing so would place FERC in the position of applying state law standards, but it does require FERC at least to confirm that the state has facially satisfied the express requirements of section 401. For example, where a state claims to have revoked a certification pursuant to section 401(a)(3), FERC has an obligation to confirm that the state has done so in a way that satisfies the restrictions of that subsection. *Keating*, 927 F.2d at 624-25. Likewise, when a state issues a water quality certification, FERC has an obligation to confirm, at least facially, that the state has complied with section 401(a)(1)'s public notice requirements.

Section 401(a)(1) requires states to "establish procedures for public notice in the case of all applications for certification." 33 U.S.C. § 1341(a)(1). The State of Washington has complied with this provision by adopting section 173-225-030 of the Washington Administrative Code, which provides: "Whenever an application for [section 401] certification . . . is filed . . . (1) Public notice . . . shall be performed . . . as follows: (a) By mailing notice of the application for certification to persons or organizations who have requested the same and to all others deemed appropriate . . . ." WASH. ADMIN. CODE 173-225-030 (1975). In addition, section 173-225-030 permits the state to publish notice in a newspaper of general circulation, if such additional notice is "desirable in the public interest." *Id.* § 173-225-030(1)(b). We do not, however, think FERC's obligation is limited to confirming that the state has enacted a public notice procedure. Rather, we think that, by implication, section 401(a)(1) also requires states to *comply* with their public notice procedures, and therefore it requires FERC to obtain some minimal confirmation of such compliance, at least in a case

where compliance has been called into question. Otherwise, FERC has no assurance that the certification the state has issued satisfies section 401, and in the absence of such an assurance, it has no authority to grant a license.

We do not mean to suggest that FERC should resolve disputes relating to whether the state's public notice procedures have been satisfied, for doing so would require FERC to construe state law. However, some minimal form of public notice is an explicit requirement of section 401, which is federal law, and therefore in a case such as this one, where public notice has been called into question, we think FERC has a role to play in verifying compliance with state public notice procedures at least to the extent of obtaining an assertion of compliance from the relevant state agency. FERC argues that the state "was no longer troubled by the issue," but this point is without legal significance, because section 401 sets forth constraints upon FERC's authority to act.

Nevertheless, we do not think our conclusion requires us to vacate the 1998 license, especially because vacating the 1998 license would allow Tacoma to operate under annual renewals of its 1924 minor part license and would likely have greater adverse impact on water quality than leaving the license in place. FERC should seek an affirmation from Ecology that it complied with state law notice requirements when it issued its water quality certification or, if it did not, that it has done so in response to this decision.

D

The Tribe asserts that FERC violated section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f, which requires federal agencies to consider the effect of their actions on certain historic or culturally significant sites and properties

(expressly including those of Indian tribes) and to seek ways to mitigate those effects. FERC complied with its section 106 obligation, and it expressly took into consideration the comments of the Advisory Council on Historic Preservation, adopting some of the Council's suggestions. *City of Tacoma*, 84 FERC at 61,564-66. The Tribe argues, however, that FERC failed to take into consideration and mitigate the impact the *original project* had in 1924 on historic and culturally significant sites. [Blue Br., p. 45] We need not decide whether section 106 requires consideration of past impacts in the course of a relicensing proceeding, because FERC took the prior impact of the Cushman Project into account. In its July 30, 1998 order, FERC stated: "[W]e acknowledge that the Cushman Project has had adverse environmental effects because of its diversion of water out of the North Fork Skokomish River. To mitigate some of those effects, we are adopting many, but not all, of the agencies' recommended terms and conditions for the Cushman Project license. . . . We believe these measures provide sufficient protection for historic properties." *Id.* at 61,566.

As an aside, it is worth noting our conclusion that FERC must include Interior's section 4(e) conditions in the new license may alter the analysis of what impact the license will have on historic or culturally significant sites and properties, thereby requiring the Commission to consider anew the effects of its actions.

E

The Tribe argues FERC violated the Coastal Zone Management Act ("CZMA") by issuing a license without a concurrence from Ecology confirming compliance with Washington's coastal program. The CZMA requires an applicant for any federal license affecting land, water, or natural resources of a coastal zone to certify compliance with the

relevant state's coastal program, and the state must then concur in the applicant's certification, though if no concurrence is forthcoming within six months, the state's concurrence "shall be conclusively presumed." 16 U.S.C. § 1456(c)(3)(A). On June 20, 1996, Tacoma certified compliance with Washington's coastal program, and on May 6, 1997, Ecology issued a somewhat equivocal concurrence. Ecology's letter stated that Tacoma's proposal for operating the Cushman Project "d[id] not comply with Washington's Coastal Zone Program," but nevertheless "the purposes of the Coastal Zone Program will be better met by declining to object." The letter continued: "Therefore, . . . Ecology hereby declines its right to take action under its Coastal Zone Management authority . . . . Ecology hopes that declining further CZM review . . . will allow FERC to proceed with licensing without further delay. This letter constitutes the formal agency action on CZM related to this licensing proceeding." (Paragraph breaks omitted.)

Though Ecology's ultimate decision not to object was unambiguous, the element of reluctance in Ecology's letter cast some doubt over the matter. That doubt, however, was cleared away when the United States Department of Commerce ("Commerce"), which administers the CZMA, ruled that Ecology's letter constituted the state's conclusive concurrence in Tacoma's certification. Commerce's 1997 ruling with respect to the letter satisfied FERC, which issued the new license to Tacoma. *City of Tacoma*, 84 FERC at 61,546.

The Tribe subsequently prevailed in state court litigation challenging the validity, under state law, of Ecology's concurrence. *Skokomish Indian Tribe v. Fitzsimmons*, 982 P.2d 1179 (Wash. Ct. App. 1999). The state court held that Ecology had issued its concurrence in violation of state administrative law, *id.* at 1184-86, though it expressly did not rule on the merits of whether the concurrence was warranted, *id.* at 1183 n.3.

When FERC issued the license, however, the question at issue before FERC was only the federal-law effect of Ecology's letter stating its concurrence, and Commerce had ruled that the letter should be treated as a valid concurrence for federal law purposes. Under the circumstances, FERC did not need to delay licensing until all state-law challenges to Ecology's actions were complete.

Moreover, after the state court invalidated Ecology's concurrence, Ecology issued a new letter on February 9, 2000, stating the specific conditions that would satisfy its coastal program, and those conditions are generally consistent with the license FERC issued in 1998. Specifically, Ecology stated that Tacoma should release a minimum of 240 cfs (or inflow, whichever is less) to the North Fork riverbed and Tacoma should "participate in an adaptive management process with the goal of increasing flows in the river to more natural levels." FERC concluded that, because Tacoma's 1998 license met Ecology's conditions, reopening the CZMA certification process would serve no purpose. *City of Tacoma*, 104 FERC ¶ 61,324, at 62,223 (2003), *order on reh'g*, 105 FERC ¶ 61,333, at 62,544-45 (2003). We agree.

The Tribe argues that, regardless of Commerce's ruling, Tacoma should have sought a new CZMA certification due to the listing of three species as endangered under the ESA. *See* 15 C.F.R. § 930.66(a). FERC, however, took into account the recommendations of the BiOps with respect to these species, amending several articles of the 1998 license, and Ecology never suggested to Tacoma that the listing of these species altered its conclusion with respect to coastal program compliance. *See id.* § 930.66(b). Under the circumstances, we think FERC reasonably concluded that a supplemental certification was unnecessary.

F

The Tribe argues that Tacoma lacks water rights for the water it uses in connection with the Cushman Project. On November 13, 1993, Ecology sent a nine-page letter to FERC, describing in detail the ways in which Tacoma had "mischaracterize[d] the extent of its state water rights." Ecology reiterated its position in two subsequent letters to FERC, one dated January 25, 1994, and the other dated October 27, 1994. The Tribe then raised this issue in its request for reconsideration of the July 30, 1998 order granting the license. FERC rejected the Tribe's argument, noting that Tacoma had applied for additional water rights and that section 27 of the FPA, 16 U.S.C. § 821, deprived FERC of authority to adjudicate issues related to state water rights. *City of Tacoma*, 86 FERC at 62,073 n.13. The Tribe next brought a motion asking FERC to add two new articles to the license: (1) "an article requiring Tacoma's compliance with its existing state water rights to the satisfaction of . . . Ecology or a court of competent jurisdiction, including if necessary Tacoma's restricting its water usage to match its authorized amount"; and (2) "an article reserving [FERC's] authority to unilaterally modify the Cushman Project license as may be necessitated by action on Tacoma's water rights taken by . . . Ecology or a court of competent jurisdiction."

We agree with FERC that the articles the Tribe proposed in this motion are unnecessary in light of section 27 of the FPA. Section 27 provides:

Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821. If FERC lacks power to "affect[] or . . . interfere with" state water rights, then the license FERC issued for the Cushman Project does not (and cannot) exempt Tacoma from meeting its water rights obligations under state law. Incorporating those water rights obligations into the license would serve no purpose other than to interpose FERC, in its role as enforcer of the license, into a matter that is not its concern. The Tribe argues that FERC, by issuing the license, has "condone[d] Tacoma's blatant violation" of state water rights law. It cannot under section 27.

### III

### A

Tacoma argues the license conditions FERC has imposed make the Cushman Project more costly to operate than the value of the power the project generates. On that account, Tacoma asserts the license amounts to a *de facto* decommissioning of the project, in violation of sections 14 and 15 of the FPA.

Under the FPA, any of several things can happen when a license to operate a hydroelectric facility expires: (1) the federal government can take over the project, 16 U.S.C. § 807; (2) FERC can issue a new license to the same licensee "upon reasonable terms," *id.* § 808(a)(1); (3) FERC can issue a license to a different licensee "upon reasonable terms," *id.*; (4) FERC can license all or part of the project for nonpower use, *id.* § 808(f); and (5) FERC can decline to issue a new license. The last option is implicit in section 4(e), which gives to FERC the authority to decide "*whether* to issue any license under this subchapter." *Id.* § 797(e) (emphasis added); *see also Escondido*, 466 U.S. at 778 n.20. If the Commission decides not to issue a new license, however, the Act is silent with respect to the disposition of the project works and any other remedial

measures that might be necessary to restore the environment. For example, on the one hand, failure to maintain a dam after a project ceases operations would lead to the gradual deterioration of the dam's structural integrity followed by a possible catastrophe (and huge liability for the landowner) should the dam suddenly give way. On the other hand, the project's former operator may not want to bear the cost of maintaining the dam when it no longer receives revenues from the project, and if the former operator removes the dam, homes and businesses that have come to rely on the presence of the dam may lose much of their value. FERC could, of course, address these issues at the time of licensing by imposing appropriate license conditions, 16 U.S.C. § 799, but it is not clear whether, in the absence of express license conditions, FERC has the authority to impose obligations and costs on a former licensee.

When Congress first enacted the FPA in 1920, its general expectation may have been that FERC would renew hydroelectric project licenses in perpetuity, making post-license disposition of project works unnecessary. At that time, the Act included few provisions protecting the environment, and the general focus was on development of the nation's resources. But with the later addition of various provisions protecting the environment, and also fish and wildlife, the possibility arose that existing projects would be inconsistent with the new values embodied in the law, and FERC might therefore decline to renew a license, or it might issue a renewal on terms the licensee found objectionable. Aware of this possibility, FERC published a "policy statement" in the Federal Register in 1995, claiming authority to decommission existing projects at the time of relicensing and to impose decommissioning costs on the former licensee. *See Project Decommissioning at Relicensing; Policy Statement*, 60 Fed. Reg. 339 (FERC Jan. 4, 1995). The validity of this policy has never been tested in the courts.

Tacoma argues that FERC has no authority to decommission a project unilaterally at the time of relicensing. Rather, sections 14 and 15 of the FPA list several possibilities upon expiration of a license term, and FERC's decommissioning policy is simply not on the list. Tacoma suggests that if FERC does not want to renew Tacoma's 1924 license, and it cannot find another party to take over the Cushman Project, then the federal government must itself take over the project. Of course, FERC did not decommission the Cushman Project; rather, it issued a new license to Tacoma to *operate* the project. Nevertheless, Tacoma claims FERC loaded up the new license with so many conditions Tacoma has no choice but to shut the project down. In that way, FERC effectively decommissioned the project by the ruse of offering an uneconomic license and saying, in effect, "Take it or leave it." Tacoma argues "FERC may not do indirectly that which it has no authority to do directly—or, in other words, *de facto* decommissioning." Pet'rs' Br. 23.

In pressing this argument, Tacoma emphasizes FERC's concession that the new license is uneconomic. Specifically, FERC's own finding is that the "net benefits" of the Cushman Project are "negative $2.06 million" per year. This concession has limited significance, however, in light of FERC's decision in *Mead Corp., Publishing Paper Division*, 72 FERC ¶ 61,027 (1995). In *Mead Corp.*, FERC concluded it is institutionally unqualified to make business judgments about the long-term economic viability of hydroelectric projects, especially in light of the "new era of competition" in the electric power industry and the unpredictability of market conditions over the course of a thirty- or fifty-year license term. *Id.* at 61,068, 61,070. In addition, FERC noted that the potentially high cost associated with decommissioning a project might prompt a licensee to continue operating a project though the project is only marginally viable economically. *Id.* at 61,068. Accordingly,

FERC determined that it would cease the practice of projecting long-term costs when assessing the economic benefits of a project. Instead, it would focus (for the most part) on then-existent conditions, and it would leave to the prospective licensee the decision whether or not to accept the license. *Id.* at 61,069-70. FERC expressly noted the possibility that, under this new approach, it might license projects that had "negative economic benefits." *Id.* at 61,069.

In light of *Mead Corp.*, Tacoma finds far too much significance in FERC's concession that the Cushman Project is uneconomic under the new license. The project may offer advantages to Tacoma that are not readily quantifiable, and market conditions may change significantly over the next forty years, making the project economically viable over the long-term. Tacoma's more persuasive point is that the take-it-or-leave-it attitude FERC expressed in *Mead Corp.* is inconsistent with FERC's statutory obligation under the FPA. Section 15 of the FPA requires FERC to offer a new license on "reasonable terms," or an annual renewal of the old license, and in Tacoma's view, an uneconomic license is *per se* an unreasonable license. FERC responds that its duty is to issue licenses that reflect the congressional mandate irrespective of whether those licenses make good business sense.

In some cases, a change in congressional priorities might cast doubt on a once viable project and lead to closure of the project when its license expires, either because FERC denies a new license outright or because FERC issues a new license that the licensee finds too costly or burdensome. In FERC's decommissioning policy statement, FERC argues persuasively that it cannot guarantee license renewal when Congress has greatly altered the regulatory landscape during the course of the prior license term. 60 Fed. Reg. at 341-43. Moreover, the very fact that a license may not exceed fifty years, *see* 16 U.S.C.

§ 808(e), indicates Congress's intent that projects be reevaluated from time to time in light of changing circumstances and national priorities, and this reevaluation necessarily implies that in some cases new licenses will not be issued.

One of the major shifts in national priorities since the 1920s has been from a near-exclusive focus on development to an increasing focus on environmental protection, and this shift is reflected in amendments to the FPA. In the 1920s, the FPA contained only two provisions aimed at protecting natural resources: (1) section 4(e) included a provision protecting reservations and authorizing the Secretary of any federal agency overseeing a reservation to impose appropriate license conditions, 16 U.S.C. § 797(e), and (2) section 18 gave the Secretary of Commerce (and later the Secretary of the Interior) the power to impose license conditions governing the construction of fishways, *id.* § 811. Starting in the 1950s, however, environmental protection became an increasingly important concern, and FERC's hydroelectric decisions reflected this shift in national values.

Then, in 1972, Congress enacted the Clean Water Act, under which state water protection agencies must give a water quality "certification" before FERC can license a hydroelectric project. 33 U.S.C. § 1341(a)(1). In addition, section 7 of the ESA, first enacted in 1973, requires FERC to impose license conditions that are necessary to protect any listed species. 16 U.S.C. § 1536(a)(1). Finally, in 1986, Congress amended the FPA to add the following provision to section 4(e):

> In deciding whether to issue any license under this Part for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and

enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

Pub. L. No. 99-495, § 3(a), 100 Stat. 1243, 1243 (1986) (codified at 16 U.S.C. § 797(e)). At the same time, Congress also required FERC to consult with state and federal wildlife protection agencies and to include license conditions to protect fish and wildlife. *Id.* § 3(c), 100 Stat. at 1244 (codified at 16 U.S.C. § 803(j)).

In light of these sweeping changes in FERC's statutory mandate, FERC not only has the authority but also the obligation to evaluate existing projects completely anew upon expiration of their license terms. If Congress's enactments are to have any meaning at all, then Congress must have envisioned major changes at some if not all of these existing projects. In cases where these changes render the project impractical, then closure becomes a possibility. As FERC put the point: "[T]he Commission does not read the [Federal Power] Act as requiring it to issue a license." 60 Fed. Reg. at 342. Nothing in the FPA suggests that Congress intended to "grandfather" existing projects so they could continue to operate indefinitely despite changes in national priorities.

Tacoma relies heavily on the provision of the FPA requiring FERC to grant new licenses "upon reasonable terms," 16 U.S.C. § 808(a)(1), but we cannot accept the implication that "reasonable terms" means the same terms that were imposed eighty years ago, or that "reasonable terms" means terms that ignore the present-day statutory mandate. In fact, section 15 of the Act states the opposite: "[T]he commission is authorized [upon expiration of a license] to issue a new license to the existing licensee upon such terms and conditions as may be

authorized or required *under the then existing laws and regulations*." *Id.* (emphasis added).

Therefore, the question we must decide is whether "reasonable terms" can, in some cases, be terms that may have the effect of shutting a project down or occasioning a change of ownership. We think the answer is yes, especially here where, according to FERC's factual finding, Tacoma has recouped its initial investment plus a significant annual return on that investment. The obligation to give "equal consideration" to wildlife protection and the environment, *id.* § 797(e), implies that, at least in some cases, these environmental concerns will prevail. At the very least, the Act is ambiguous, and FERC's interpretation of its statutory authority is reasonable and entitled to deference under *Chevron*, 467 U.S. at 842-43.

In conclusion, we find persuasive FERC's argument that Congress implicitly extended to FERC the power to shut down projects either directly, by denying a new license, or indirectly, by imposing reasonable and necessary conditions that cause the licensee to reject the new license. We have no cause to decide in this case whether, and in what circumstances, FERC can impose decommissioning obligations or costs on a former licensee.

B

Tacoma asserts that it will not operate the Cushman Project under the license FERC has issued, and therefore FERC's environmental impact statement, required under 42 U.S.C. § 4332(2)(C), should have given consideration to the impact shutting the project down would have on the environment. We decline to address this issue in light of our conclusion that FERC must include Interior's section 4(e) conditions in Tacoma's license. The inclusion of these conditions will substantially alter

the character of the license, requiring FERC to reweigh power and nonpower interests and reassess environmental impacts. We think Tacoma's argument is more properly considered after such reassessment takes place.

C

Tacoma argues FERC acted arbitrarily and capriciously in relying upon flawed BiOps. In order to address this argument, we start with some general background on the multi-agency statutory scheme the ESA establishes.

The ESA imposes an obligation on all federal agencies to protect listed species. 16 U.S.C. § 1536(a)(1)-(2). If a federal agency concludes that an anticipated action is likely to jeopardize the existence of a listed species or adversely modify its critical habitat, the agency must consult with the appropriate expert agency, either the Fisheries Service or the Fish and Wildlife Service. *Id.* § 1536(a)(2), (4); 50 C.F.R. § 402.01(b). The consultant agency then prepares a BiOp, finding either no jeopardy or suggesting "reasonable and prudent alternatives" that would protect the species and its habitat. 16 U.S.C. § 1536(b)(3)(A).

The ESA also makes it unlawful for any person to "take" a listed species, *id.* § 1538(a)(1)(B), (C), which "means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a listed species, or to attempt to do so, *id.* § 1532(19). Nevertheless, if an agency's proposed action (including any incidental taking of a listed species that will result from the action) will not jeopardize the existence of the species or adversely modify its critical habitat, the consultant agency must provide the action agency—here, FERC—with a "written statement," known as an Incidental Take Statement ("ITS"), specifying "reasonable and prudent measures" the consultant

agency deems appropriate to minimize any impact on the species and setting forth "terms and conditions" to implement those measures. *Id.* § 1536(b)(4)(ii), (iv). If the action agency complies with those terms and conditions, then any taking that results from the agency's action is permissible. *Id.* § 1536(o)(2).

This interagency consultation process reflects Congress's awareness that expert agencies (such as the Fisheries Service and the Fish and Wildlife Service) are far more knowledgeable than other federal agencies about the precise conditions that pose a threat to listed species, and that those expert agencies are in the best position to make discretionary factual determinations about whether a proposed agency action will create a problem for a listed species and what measures might be appropriate to protect the species. Congress's recognition of this expertise suggests that Congress intended the action agency to defer, at least to some extent, to the determinations of the consultant agency, a point the Supreme Court recognized in *Bennett v. Spear*, 520 U.S. 154, 169-170 (1997). In *Bennett*, the Court stated that an action agency disregards a jeopardy finding in a BiOp "at its own peril" and bears the burden of articulating the reasons for reaching its contrary conclusion. *Id.*

Accordingly, when we are reviewing the decision of an action agency to rely on a BiOp, the focus of our review is quite different than when we are reviewing a BiOp directly. In the former case, the critical question is whether the action agency's *reliance* was arbitrary and capricious, not whether the BiOp itself is somehow flawed. *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir. 1999); *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990); *Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984); *cf. Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 790 (9th Cir. 2005) (direct review of a BiOp). Of course, the two inquiries overlap

to some extent, because reliance on a facially flawed BiOp would likely be arbitrary and capricious, but the action agency "need not undertake a separate, independent analysis" of the issues addressed in the BiOp. *Aluminum Co.*, 175 F.3d at 1161. In fact, if the law required the action agency to undertake an independent analysis, then the expertise of the consultant agency would be seriously undermined. Yet the action agency must not blindly adopt the conclusions of the consultant agency, citing that agency's expertise. *Id.* Rather, the ultimate responsibility for compliance with the ESA falls on the action agency. 16 U.S.C. § 1536(a)(1)-(2). In *Pyramid Lake*, the Ninth Circuit balanced these two somewhat inconsistent principles and articulated the following rule:

> [E]ven when the [consultant agency's] opinion is based on "admittedly weak" information, another agency's reliance on that opinion will satisfy its obligations under the Act if a challenging party can point to no "new" information—*i.e.*, information the [consultant agency] did not take into account—which challenges the opinion's conclusions.

898 F.2d at 1415; *see also Defenders of Wildlife v. U.S. EPA*, 420 F.3d 946, 959, 976 (9th Cir. 2005); *Stop H-3 Ass'n*, 740 F.2d at 1459-60.

Here, Tacoma does not claim that it presented FERC with new information that was unavailable to the Fisheries Service or the Fish and Wildlife Service and that would give FERC a basis for doubting the expert conclusions in the BiOps those agencies prepared. It does not suffice, when urging an action agency to reject the BiOp of a consultant agency, simply to reargue factual issues the consultant agency already took into consideration. *Pyramid Lake*, 898 F.2d at 1415-16; *Stop H-3 Ass'n*, 740 F.2d at 1459-60. Because Tacoma did not assert new information that called into question the factual conclusions of the BiOps,

FERC was justified in relying on the BiOps and did not act arbitrarily and capriciously in doing so.

Tacoma also challenges the validity of the BiOps themselves, arguing that they are legally flawed and unsupported by the evidence.  Although in other contexts a BiOp is subject to independent review in a proceeding in which the agency issuing the BiOp is a party, *see, e.g.*, *Nat'l Wildlife Fed'n*, 422 F.3d at 790, when a BiOp is prepared in the course of a FERC licensing proceeding, the only means of challenging the substantive validity of the BiOp is on review of FERC's decision in the court of appeals.  *See* 16 U.S.C. § 825*l*(b); *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958); *California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 912 (9th Cir. 1989); *City of Tacoma v. Nat'l Marine Fisheries Serv.*, 383 F.Supp.2d 89 (D.D.C. 2005); *cf. Defenders of Wildlife*, 420 F.3d at 956 (in review of EPA decision, court of appeals has jurisdiction to consider adequacy of BiOp on which EPA relied).  Accordingly, Tacoma properly brings this challenge as part of the present proceeding, and the participation of the consultant agencies that prepared the BiOps has ensured that the matter is adequately presented.  Our review is governed by section 706 of the Administrative Procedure Act, requiring us to determine that agency decisions are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706; *see Bangor Hydro-Elec. Co. v. FERC*, 78 F.3d 659, 663 & n.3 (D.C. Cir. 1996); *Pyramid Lake*, 898 F.2d at 1414.  Therefore, the BiOps and the ITSs must be upheld as long as the agencies "considered the relevant factors and articulated a rational connection between the facts found and the choice made."  *Ariz. Cattle Growers' Ass'n v. FWS*, 273 F.3d 1229, 1235-36 (9th Cir. 2001).

Tacoma argues that the BiOp of the Fisheries Service improperly required upstream and downstream fish passage as

a "reasonable and prudent measure[]," 16 U.S.C. § 1536(b)(4)(ii), to minimize take of the two listed salmon species. Tacoma complains that this requirement duplicated terms that already existed in the proposed license. Tacoma, however, does not persuade us that this duplication of license terms is per se improper.

Tacoma also complains that the same BiOp "anticipates . . . incidental take of Puget Sound chinook salmon" but does not mention any incidental take of the other endangered species under consideration, the summer chum. Despite this oversight, the BiOp's list of "reasonable and prudent measures" refers to protection of the summer chum, giving rise to an internal inconsistency. Tacoma, however, concedes that this oversight was an "apparent[] mistake[]," as is clear from the overall context. This oversight does not render the BiOp invalid.

Tacoma further objects that the BiOp lists fish passage facilities as being necessary to minimize incidental take of summer chum, though the BiOp acknowledges summer chum historically did not ascend the river as far as the dams. Here, Tacoma simply misreads the BiOp. The BiOp lists eight measures that together will minimize take of the two endangered salmon species. The BiOp does not specify which measure is needed to minimize incidental take of which species, nor does it suggest fish passage in particular is necessary to minimize incidental take of the summer chum.

Tacoma next notes the BiOp's list of "reasonable and prudent measures" requires "a minimum instream flow of 240 cfs, or natural inflow," at the lower dam. The BiOp omits from this requirement the words "whichever is less"—words that are included in the comparable provision in article 407 of the license. Tacoma argues that this omission has the effect of requiring a minimum release of 240 cfs even when inflow is

much lower than 240 cfs. Tacoma, in effect, interprets the requirement as if it called for release of 240 cfs, or inflow, whichever is *more*. That interpretation, however, makes no sense because it would drain the lakes, after which the requirement could no longer be met. Moreover, in other places, the BiOp discusses the effect of "[a] flow of 240 cfs, or inflow, whichever is less," thereby making clear that the omission of the words "whichever is less" from the BiOp's list of "reasonable and prudent measures" was an unintended oversight. FERC reached just this conclusion when this issue was called to its attention. *City of Tacoma*, 110 FERC ¶ 61,140, at 61,544 (2005). We do not think that the BiOp needs to be amended to correct this error. Rather, it should be interpreted as if the words "whichever is less" were expressly included. Of course, this clarification of the BiOp may have limited significance in light of our conclusion regarding Interior's section 4(e) conditions, because one of Interior's conditions is a continuous release of 240 cfs, irrespective of inflow.

Finally, Tacoma questions the sufficiency of the evidence supporting both BiOps, arguing they are based on speculation about species migration through the intakes of the powerhouse tunnels and related survival rates. Tacoma primarily objects to the agencies' reliance on inferences where actual species behavior has not been verified *in situ*. We conclude, however, that a BiOp is not fatally flawed when it relies, as the BiOps do here, on inferences drawn from observations of the same (or a similar) species, in close geographic proximity, adapting to analogous facilities and conditions. Minimal reliance on such inferences does not undermine the rational connection between the facts found and the choices made.

The decision in *Arizona Cattle Growers*, is not to the contrary. In that case, the court rejected an ITS where the service failed to provide any evidence of the existence of the

species on the land for which the statement was prepared. *Arizona Cattle Growers*, 273 F.3d at 1244. Here, the listed species *are* present in the general project area and the dispute relates to speculation about possible migratory patterns and survival rates. Although the agencies are unable to document activity of the species in every segment of the project, their conclusions are based on actual observations at very similar projects. The "agenc[ies] have a very low bar to meet," *id.*, and we think they have met it here. The *Arizona Cattle* court concluded that "the use of ecological conditions as a surrogate for defining the amount or extent of incidental take is reasonable so long as these conditions are linked to the take of the protected species." *Id.* at 1250. Likewise, we find inferences drawn from the behavior of the same (or a similar) species in analogous conditions a reasonable substitute for actual observations in these limited circumstances.

Accordingly, we reject Tacoma's challenge to the validity of the BiOps, and we find no error in FERC's reliance on them.

IV

Save the Lakes Coalition ("SLC") is an organization of homeowners and businesses that surround Lake Cushman and Lake Kokanee and share an interest in keeping water levels in the lakes unchanged. SLC argues that FERC should have granted its request to be consulted regarding changes in lake water levels that become necessary under article 413 of the license. It also sought to be included in article 405's list of parties that had to agree to any temporary changes in lake levels. FERC rejected these requests, and we believe it fell within FERC's discretion to do so. FERC noted SLC can petition FERC in the future if Tacoma does not comply with minimum water level requirements, and it can seek to intervene in any future proceeding that might affect water levels. We think these

remedies adequately protect SLC. If the changes in the license that result from this opinion will be likely to impact water levels in the lakes, we think FERC should give SLC a reasonable opportunity to express its views, and FERC should take those views into consideration.

V

In our order of May 3, 2005, we stayed the minimum-flow requirements set forth in article 407 of the license. In light of our conclusion that FERC is obligated to include Interior's section 4(e) conditions in the license, including several conditions imposing minimum flow requirements in excess of those in presently set forth in article 407, we hereby vacate our stay.

VI

We deny the petitions in part, grant them in part, and remand to FERC, without vacating the license. On remand, if FERC determines upon including the section 4(e) conditions that it will issue a license, then it should amend its 1998 licensing order (making such adjustments to the license as are required to conform to inclusion of the conditions) and then lift its partial stay of that order. If FERC determines not to issue a license, then it should lift its partial stay and vacate its order issuing the 1998 license.

*So ordered.*